**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| STANLEY STEPHENS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:13-cv-01503-TWP-DML |
| | ) |
| CITY OF LAWRENCE, MICHAEL WALTON, | ) |
| ERIKA SCHNEIDER, MICHAEL MCKENNA, | ) |
| JAMES PARISH, and SCOTT EVANS, | ) |
| | ) |
| Defendants. | ) |

**ENTRY ON CROSS MOTIONS FOR SUMMARY JUDGMENT**

This matter is before the Court on the parties cross motions for summary judgment.

Plaintiff Stanley Stephens ("Stephens") filed a Motion for Partial Summary Judgment (Filing No.

39) and Defendants City of Lawrence, Michael Walton ("Walton"), Erika Schneider

("Schneider"), Michael McKenna ("McKenna"), James Parish ("Parish"), and Scott Evans's

("Evans") (collectively, "Defendants") filed a Motion for Summary Judgment and Opposition to

Plaintiff's Motion for Partial Summary Judgment (Filing No. 47). Stephens, a lieutenant on the

Lawrence Police Department and a Republican City Councilor, initiated this action, asserting

violations of his rights under the First Amendment and the Due Process Clause of the Fourteenth

Amendment of the United States Constitution and various state law claims. Specifically, following

a conversation between Lawrence police officers Stephens and McKenna, which was secretly

recorded by McKenna, Stephens was investigated for misconduct and eventually terminated from

his employment with the Lawrence Police Department.  Stephens filed a Motion for Partial

Summary Judgment on his First Amendment retaliatory termination claim; thereafter, Defendants

filed a Cross Motion for Summary Judgment on all claims.  For the reasons stated below,

Stephens's Motion for Partial Summary Judgment is denied, and Defendants' Motion for Summary Judgment is granted in part and denied in part.

## I. BACKGROUND

The dispute in this matter arose in January 2012, shortly after the defeat of Republican Mayor Paul Ricketts by Democratic Mayor Dean Jessup.

Until his termination in October 2012, Stephens was an employee of the Lawrence Police Department ("LPD") for twenty-three years, earning the rank of lieutenant. Stephens worked primarily as a K-9 handler for LPD and his K-9 partner was Yank, a Czechoslovakian Shepard that Stephens raised from a puppy. Stephens had more than fifteen years of experience as a K-9 handler and had eight weeks of specialized training with Yank through the Indianapolis Metropolitan Police Department. In addition to working for LPD, from 2008 to 2011, Stephens also served as a Republican councilor on the Common Council for the City of Lawrence, Indiana (the "Council"). During the 2011 election season, Stephens had actively campaigned for Mayor Jessup and worked to defeat former Mayor Ricketts with whom he had had a falling out.

McKenna is a law enforcement officer with LPD. He is the son-in-law of former Mayor Ricketts and a friend of fellow LPD officers Evans and Shawn Romeril ("Romeril").

Erika Schneider is a captain with LPD. Schneider and Romeril are cousins. Schneider also is the daughter-in-law of former Republican City of Lawrence Mayor Tom Schneider and a longtime friend of Evans.

Scott Evans is a lieutenant with LPD.

Michael Walton is the chief of LPD. Walton and James Parish have known each other for more than twenty years from their work in law enforcement. Before the City of Lawrence elections in 2012, Walton and Parish would meet for coffee and discuss the direction in which they wanted

LPD to go if Dean Jessup was elected mayor and Walton was selected to serve as the chief of police. Walton believed he knew Parish better than anyone else at LPD.

James Parish is a lieutenant with LPD and also an employee of the Metropolitan School District of Lawrence Township. In early 2012, Walton appointed Parish to the rank of captain; however, Parish has since resigned from the position of captain. Parish was well connected politically and during his career with LPD, Parish has held almost every position in the police department. Parish's daughter is married to former Mayor Tom Schneider's son. Parish's wife is a civilian employee of LPD. Parish and Evans have had a close relationship through their law enforcement employment. Since the end of 2010, Parish has worked as the director of security for the Metropolitan School District of Lawrence Township. In this position, Parish is paid a flat rate for forty hours of work per week to coordinate school security during schools hours and some after school events. Parish's school security position provides an assistant and administrative assistant and requires him to manage up to eighteen off-duty officers working security at eleven different schools. While Parish admits receiving school security telephone calls while on duty with LPD, he denies ever working school security while on duty with LPD.

John Nelson ("Nelson") is a lieutenant with LPD. He is trained to be an internal investigator and has conducted internal investigations for LPD. In January 2012, Nelson was the third shift commander and was McKenna's supervisor.

In early 2011, Stephens and Democratic Councilor Linda Treat ("Treat") began investigating Evans and Parish for committing "ghost employment." A review of Evans's unconfirmed timesheets and LPD computer-aided dispatch ("CAD") logs revealed a significant amount of unaccounted but compensated time. Parish was believed to be working for and compensated by both LPD and the school district for parallel hours, thus working for the school

district while being paid by LPD.  Stephens took the information about Evans committing ghost employment to then LPD captain James Vaughn.  Then Stephens and Treat took the information about both Evans and Parish to the Marion County Prosecutor's Office and the State Board of Accounts.  Later, they contacted the Federal Bureau of Investigation to share the information about Evans's and Parish's ghost employment.  On May 25, 2011, Stephens met with an agent from the FBI to discuss the information he had gathered about Evans.  Months later, on January 10, 2012, Stephens discussed the information he had about Parish committing ghost employment with the FBI.  In early February 2012, Treat, then Council president, met with Councilor Dave Parnell and Mayor Jessup in the mayor's conference room.  The three discussed Parish and Evans and the allegations of them committing ghost employment.

The history of political discord between Stephens and former Republican City of Lawrence Mayor Paul Ricketts began in late 2010.  At that time, Stephens advocated to elect Don Poteet as Council president over Ricketts's chosen candidate, David Freeman, and in January 2011, Don Poteet was elected Council president.  Around this same time, Stephens proposed and helped secure the necessary votes to pass Amended Ordinance No. 29, 2010 against Ricketts's wishes. On April 29, 2011, Ricketts vetoed Amended Ordinance No. 29, 2010 because he considered it an attempt by the Council to usurp the authority of the executive branch. On May 2, 2011, the Council overrode Ricketts's veto and passed Amended Ordinance No. 29, 2010.

Just over two weeks later, on May 18, 2011, Stephens was involuntarily transferred from his position as lieutenant K-9 handler to second shift commander.  The transfer separated Stephens against his will from the K-9 unit and his K-9 partner Yank.  Thereafter, Romeril was moved to the K-9 unit and partnered with Yank.  On September 22, 2011, Stephens filed a complaint in this

District Court against the City of Lawrence, Ricketts, and others, asserting that his involuntarily transfer was in retaliation for his political activities and speech.

After his involuntarily transfer from the K-9 unit and from his K-9 partner Yank, Stephens began campaigning against Ricketts in the mayoral elections, first on behalf of Republican primary challenger John Solenberg and then on behalf of Democratic candidate Dean Jessup.  Ricketts lost the general election to Dean Jessup.

Mayor Jessup and his administration took office the beginning of January 2012.  Mayor Jessup selected Walton to serve as chief of LPD.  Walton initially selected Parish as his deputy chief, but Mayor Jessup would not allow the appointment because of Parish's history with the department.  Walton understood Mayor Jessup's comment to be a negative reference to Parish's interpersonal relationships with other officers.  Walton instead offered the position of captain over administration to Parish, which he accepted.  Before this appointment, Parish's office had been remotely moved to a Shadeland Avenue address where he worked alone.

On January 11, 2012, shortly after Mayor Jessup took office, Stephens was transferred back to the K-9 unit and reunited with his K-9 partner Yank.  As a result, Romeril was separated from Yank after working with Yank for about seven months.  Thereafter, on March 12, 2012, a settlement agreement was entered between Stephens and all defendants, including the City of Lawrence and Ricketts, in the federal district court case that had been filed in September 2011. One provision of the agreement provided Stephens an opportunity to purchase Yank from LPD under certain conditions:

> Stanley Stephens is currently assigned as the K-9 handler for a police dog known as "Yank."  The parties agree that should Stephens be assigned to another position or should Stephens or "Yank" retire from the police department, Stephens will have the opportunity to purchase "Yank" for fair market value.

(Filing No. 42-19 at 3.)

5

Approximately a week after Stephens was transferred back to the K-9 unit and reunited with Yank, on the morning of January 19, 2012, McKenna (son-in-law of Ricketts) was at the General Brooks Government Building (the administrative headquarters for the City of Lawrence) at the end of his shift for a planned meeting with Parish.  He intended to tell Parish that Romeril informed him that Stephens was taking Yank to Stephens's part-time employment.  The designated evidence is conflicting on whether it was against LPD policy in 2012 to take police dogs to part-time employment.  However, a 2011 policy memorandum from Chief Paul Whitehead permitted use of police dogs at part-time employment.  Stephens's designated evidence alleges that Walton never issued any special orders restricting a K-9 officer from bringing his police dog to a part-time job and that Stephens was never told by Walton or Parish that he could not take Yank to his part-time job.

Also on the morning of January 19, 2012, Stephens stopped by the General Brooks Government Building while he was doing personal errands.  Stephens was not in uniform because it was his day off.  Stephens and McKenna crossed paths inside LPD's roll call area where they started a conversation.  The conversation continued as they left the roll call area, exited the building, and entered the parking lot.  Once outside, McKenna started secretly recording their conversation on his cell phone.

During the recorded conversation, Stephens complained primarily about Parish and Parish's interactions with LPD personnel.  He talked about various aspects of the K-9 program at LPD, his political influence at LPD and in the City of Lawrence, and his connections with Mayor Jessup.  He voiced concerns about work ethic and officer morale.  He also complained that Walton was being unduly influenced by Parish and that Parish was involved in conduct that was not legal by working for the school district.  Stephens's language was profanity-laced and passionate.

Soon after getting in his car and stopping the recording, McKenna called Parish and told him what had happened.   Then McKenna called Evans and told him about the recording.   While they were on duty later that evening, McKenna and Evans listened to the recording, and Evans decided that it should be reported to Parish.   McKenna called Schneider, who did not answer the phone, but she soon returned the call, and the two discussed the recording.

The next morning, on January 20, 2012, McKenna and Evans took a copy of the recording to Parish.   Parish saved the recording on his computer and listened to it, and he later played the recording for Walton.   Parish did not want the recording saved on his computer, so Walton copied the recording to a thumb drive and then deleted the file from Parish's computer.   Pursuant to LPD's command structure, McKenna and Evans were outside Parish's chain of command, and thus, any complaint McKenna or Evans wanted to make should have been submitted to their supervisors, Lieutenant Nelson or Captain Curtis Bigsbee, not to Parish, an involved person.

Parish requested that an internal investigation be completed.   Because Walton was new to the position of chief, he discussed the internal investigation process with Schneider.   She informed Walton that an internal investigation could be initiated by a formal complaint.   Thus, Walton requested a formal complaint from Parish to start an investigation.

Three days later, on January 23, 2012, Parish submitted an inter-department memorandum to Walton requesting an investigation of official misconduct.   The memorandum stated that "Stephens was using his dog off duty which was against policy," and "Parish [was] committing criminal acts involving the Lawrence Township School System."   (Filing No. 42-14 at 2.)   Parish referred to the allegations made by Stephens that were on the recording but did not refer to the recording itself or the fact that Parish already had given a copy of the recording to Walton.

Also on January 23, 2012, to address Parish's complaint, Walton assigned Schneider to conduct an internal investigation.  As part of her investigation, Schneider reviewed the recording and conducted recorded interviews with Stephens, McKenna, and Parish.  After completing her investigation, Schneider submitted a summary report of the investigation to Walton on April 23, 2012.  Schneider's summary of the investigation noted various findings and conclusions, including that the "majority of the comments made by Lt. Stephens were not of public concern," however, "one statement made by Lt. Stephens [was] of public concern."  (Filing No. 42-16 at 2.)  The statement addressing a matter of public concern was Stephens's assertion that Parish was engaged in activity that was not legal, that is, his alleged ghost employment with the school district.  As a result of her investigation, Schneider concluded that Stephens violated twenty-two LPD general orders and three Indiana statutes.  She recommended that Walton present the investigation to the City of Lawrence Police Department Merit Commission (the "Merit Commission").

Five months after Stephens's conversation with McKenna and three months after settling his initial lawsuit against the City of Lawrence and Ricketts, on June 11, 2012, Stephens was hand delivered a charging letter from Walton, notifying him of the numerous charges against him and placing him on administrative leave.  Walton's letter noted that the charges were being referred to the Merit Commission to seek Stephens's termination.  All LPD equipment and property, including police dog Yank, was collected from Stephens.

On May 7, 2012, LPD Detective Scott Hancock ("Hancock") was asked by Walton to conduct an internal investigation of Evans.  The investigation was initiated because of a complaint submitted by Stephens and city council president Treat, asserting that Evans was falsifying payroll records and committing ghost employment.  Approximately two months later, on July 22, 2012, Hancock submitted a summary of his internal investigation to Walton.  Hancock found

8

discrepancies in Evans's official timesheets on 110 days, twenty-four of which had no CAD history.  Hancock found a shortage of hours totaling 233.5 hours of time that Evans was logged on the CAD but either left early or came in late.  Hancock also found 204 hours on Evans's timesheets that had no CAD history.

On October 22, 2012, Walton issued a written reprimand to Evans for including time that was not accounted for on his timesheets in violation of an LPD general order.  Evans received only a written reprimand, rather than more severe action, because the time discrepancies occurred previous to Walton's tenure as chief, so Walton was not able to confirm whether Evans's conduct was intentional.  The written reprimand also noted Evans's positive work history and only one other prior written reprimand.

Walton and Stephens had a number of months to conduct discovery and prepare for the hearing before the Merit Commission.  From October 29 through October 31, 2012, the Merit Commission held a hearing to review the charges against Stephens and determine whether Walton's recommendation of termination was appropriate.  The hearing was held at the General Brooks Government Building and was recorded for public broadcast pursuant to the Merit Commission's rules and practices.

In the presence of the other Merit Commission members who would be deciding Stephens's fate, Merit Commission President Wilson heard and decided on a number of preliminary evidentiary issues at the beginning of the hearing.  Wilson and the attorneys viewed the preliminary evidentiary issues as a "pretrial hearing" on a "motion in limine," yet the evidentiary issues were fully argued and decided in the presence of the entire Merit Commission (Filing No. 48-4 at 11).

Wilson stated during the preliminary evidentiary determination, "I assure you that I'm going to be just as tough on the Chief with the bad stuff," when he excluded a number of witnesses

and exhibits that Stephens wanted to introduce.  (Filing No. 48-4 at 6.)  Wilson then stated to

Stephens's counsel, "I'm going to give you some latitude, since I already ruled in his [Walton's

counsel] favor."  (Filing No. 48-4 at 7.)  Just after this comment, Wilson stated, "can you give me

a minute just to kind of peruse this for a second because I spent most of last week in a chemically

induced fog. . . . These meds the doctor gave me, unlike Jimi Hendrix and Andy Warhol, I do not

do my best work under the influence of pharmaceuticals."  (Filing No. 48-4 at 7.)  Then, while

considering Walton's counsel's request to admit certain evidence, Wilson explained, "I've already

shut down Mr. Cohron [Stephens's counsel] on one thing that he wanted to bring in . . . . So if I'm

going to allow you to start bringing in all of the dirty laundry, and I'm not going to allow him to

bring in any clean laundry . . . ." (Filing No. 48-4 at 12.)

 Walton, McKenna, and Schneider testified at the hearing.  Neither Parish nor Evans

testified at the hearing.  At the conclusion of the hearing, the Merit Commission determined that

Stephens had committed nine of the LPD general order violations and determined that Walton's

recommendation to terminate Stephens was appropriate.

 Less than a week after the Merit Commission hearing concluded, on November 5, 2012,

Walton sent Treat a letter explaining that he did not believe Parish had committed ghost

employment and the matter would not be looked into any further.  On December 19, 2012, Parish

resigned as captain, requesting to be returned to the position of lieutenant on the first shift.

 On November 30, 2012, Stephens filed a verified petition for judicial review of the Merit

Commission's decision in the Marion Circuit Court.  That judicial review was limited to the Merit

Commission's process and determination.  On September 19, 2013, while the petition for judicial

review was still pending, Stephens filed his Complaint in this Court, asserting claims for violation

of his speech and due process rights and also state law claims.  On November 12, 2013, Defendants

filed a motion to dismiss or stay this action based on the pending state court review.  In response, Stephens proposed filing a voluntary dismissal of the petition for judicial review in state court for purposes of judicial economy and to litigate all the claims between the parties in this Court.  The Defendants did not object to the voluntary dismissal.  Thus, Stephens filed his motion for voluntary dismissal in the state court.  The state court petition for judicial review was dismissed with prejudice on December 6, 2013.

## II.  SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor."  *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted).  "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion."  *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted).  Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial."  *Hemsworth*, 476 F.3d at 490 (citation omitted).  "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence."  *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

11

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

These same standards apply even when each side files a motion for summary judgment. The existence of cross-motions for summary judgment does not imply that there are no genuine issues of material fact. *R.J. Corman Derailment Serv., LLC v. Int'l Union of Operating Eng'rs.*, 335 F.3d 643, 647 (7th Cir. 2003). The process of taking the facts in the light most favorable to the non-moving party, first for one side and then for the other, may reveal that neither side has enough to prevail without a trial. *Id.* at 648. "With cross-motions, [the court's] review of the record requires that [the court] construe all inferences in favor of the party against whom the motion under consideration is made." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (citation and quotation marks omitted).

## III. <u>DISCUSSION</u>

Stephens requests partial summary judgment on his First Amendment retaliatory termination claim. The Defendants oppose the partial summary judgment and seek summary judgment on all of the claims asserted by Stephens. These claims are a First Amendment retaliatory termination claim, Fourteenth Amendment due process claim, and state law claims for intentional infliction of emotional distress, breach of contract, promissory estoppel, and intentional

12

interference with a contractual relationship.   The Court will begin its analysis with the Constitutional Claims.

### 1.   *Res Judicata*

The Defendants assert that Stephens's First Amendment and due process claims are barred by the doctrine of *res judicata*.  "*Res judicata*, or claim preclusion, bars the relitigating of claims if the cause of action has been fully and finally determined on the merits between the same parties by a court of competent jurisdiction."  *Aaron v. Mahl*, 550 F.3d 659, 664 (7th Cir. 2008) (citation and quotation marks omitted).  As noted above, following his termination, Stephens filed an action in the Marion Circuit Court alleging violation of his First Amendment and due process rights.  In December 2013, Stephens moved to dismiss the state court action and the court granted the dismissal with prejudice.  The Defendants explain that Stephens's First Amendment and due process claims were fully and finally determined on the merits when Stephens's petition for judicial review was voluntarily dismissed with prejudice by the state court.  The Defendants point out that "either party may move to dismiss a claim and a dismissal with prejudice constitutes a dismissal on the merits."  *Afolabi v. Atl. Mortg. & Inv. Corp.*, 849 N.E.2d 1170, 1173 (Ind. Ct. App. 2006).

Stephens responds that "[e]conomy of time and fairness to the parties is the cornerstone of the policy.  For this reason, *res judicata* has been considered over the years as a defense which must be affirmatively pleaded before the second tribunal."  *Board of Zoning Appeals v. Sink*, 285 N.E.2d 655, 658–59 (Ind. Ct. App. 1972).  *Res judicata* is an affirmative defense that must be raised in the pleadings pursuant to Trial Rule 8(c).  "*Res judicata* is a defense.  It can be forfeited if not pleaded—so it can be waived expressly."  *Arrow Gear Co. v. Downers Grove Sanitary Dist.*,

13

629 F.3d 633, 638 (7th Cir. 2010). Stephens asserts various reasons why *res judicata* does not apply in this case, including forfeiture, waiver, and fairness to the parties.

In reply, the Defendants briefly assert that they did not waive their *res judicata* argument when they failed to include it in their Answer because Stephens has not been prejudiced. The Defendants point to *Schmidt v. Eagle Waste & Recycling*, wherein the Seventh Circuit explained, "While Fed. R. Civ. P. 8(c) directs parties to raise affirmative defenses in the pleadings, a delay in raising an affirmative defense only results in waiver if the other party is prejudiced as a result." *Schmidt v. Eagle Waste & Recycling, Inc.*, 599 F.3d 626, 632 (7th Cir. 2010). The Defendants assert that Stephens was not prejudiced by their failure to include *res judicata* in their Answer because he has had an opportunity to respond to the argument in the summary judgment papers.

Stephens's unopposed motion to voluntarily dismiss his state court action specifically noted that: (1) the state court did not have jurisdiction to address some of Stephens's claims against the Defendants, (2) because of this, Stephens filed a separate action in federal court, (3) the state court could provide only piecemeal relief because of statutory limitations on judicial review, and (4) Stephens was seeking to forgo judicial review in state court to present his case in its entirety to this Court to receive full relief and to avoid delay and unnecessary litigation costs (Filing No. 56-50). Counsel did not object to Stephens's voluntary dismissal after receiving the proposed motion via email. In fact, counsel asked Stephens's counsel to file the motion that same day (Filing No. 56-40 at 4). It would be manifestly unjust, and deprive Stephens of basic fairness, to allow his voluntary dismissal—on the understanding that the claims would be litigated in this Court—to bar this action based on *res judicata*.

Further, the Defendants' argument that Stephens was not prejudiced by the lack of pleading *res judicata* fails to recognize that the Defendants' negligence in asserting *res judicata* in their

14

Answer caused a long delay in Stephens's ability to address the affirmative defense, a delay that caused Stephens to miss his opportunity to appeal the state court's order, seek clarification of the order, and conduct discovery regarding the parties' discussions leading up to the voluntary dismissal. The Defendants acknowledge in their Motion for Summary Judgment that the dismissal order was an immediately appealable judgment, and no appeal was taken. Stephens was prejudiced by the Defendants' failure to assert *res judicata* in their Answer, and therefore forfeiture is appropriate. For all of these reasons, the Court finds that *res judicata* does not apply in this case.

### 2.    Qualified Immunity

In his Motion for Summary Judgment, Stephens briefly asserts that the individual Defendants are not entitled to qualified immunity because he has asserted a violation of a constitutional right that was clearly established at the time the right was violated. His claimed constitutional right is the right to be free from retaliation.

For their part, the individual Defendants explain that they are entitled to qualified immunity in their individual capacities against Stephens's First Amendment and due process claims. "[T]he qualified immunity doctrine does not apply to official capacity claims." *Ruffino v. Sheahan*, 218 F.3d 697, 700 (7th Cir. 2000). "The law of qualified immunity requires a plaintiff to show (1) that she has asserted a violation of a constitutional right, and (2) that the right in question was clearly established at the time of the challenged action." *Id.* Thus, Stephens must show that his constitutional right was clearly established when the individual defendants violated that right, otherwise, qualified immunity will apply to protect the individual defendants. "For qualified immunity to be surrendered, preexisting law must dictate, that is, truly compel . . . the conclusion for every like-situated, reasonable government agent that what he is doing violates federal law in

the circumstances." *Khuans v. School Dist. 110*, 123 F.3d 1010, 1019–20 (7th Cir. 1997) (citation and quotation marks omitted).  Stephens did not reply to the Defendants' argument.

Each of the individual defendants was acting within the scope of their duties, and as Stephens alleges in his Complaint, each was "an employee, servant, and/or agent of Defendant City of Lawrence . . . acting under the authority conferred upon them by Defendant City of Lawrence under the color of state law."  (Filing No. 1 at 10–11.)  The individual Defendants' conduct consisted of reporting complaints and comments from a fellow LPD officer, investigating those complaints and comments, and referring charges based on the complaints and comments to the Merit Commission for consideration of terminating employment.  The individual Defendants did not conduct or preside at the Merit Commission hearing or regulate the procedures used at the hearing.  The individual Defendants did not make the decision to terminate Stephens's employment.

While protected speech is a clearly established constitutional right, it is not clear that reporting, investigating, and charging potential violations of LPD general orders based on Stephens's complaints and comments would be prohibited under the First Amendment and Due Process Clause.  Again, Stephens did not reply to the Defendants' argument, and he did not point to any analogous cases to show that qualified immunity should not apply.  Stephens has not carried his burden to show that the individual Defendants are not entitled to qualified immunity.  Thus, Walton, Schneider, McKenna, Parish, and Evans are entitled to qualified immunity against Stephens's First Amendment and due process claims in their individual capacities.

3.     **Stephens's State Law Tort Claims and Statutory Immunity**

The Indiana Tort Claims Act provides immunity from personal liability to employees of governmental entities where they act within the scope of their employment.  "A lawsuit alleging that an employee acted within the scope of the employee's employment bars an action by the claimant against the employee personally."  Ind. Code § 34-13-3-5(b).  As already noted, Stephens alleges in his Complaint that each individual defendant was "an employee, servant, and/or agent of Defendant City of Lawrence . . . acting under the authority conferred upon them by Defendant City of Lawrence under the color of state law."  (Filing No. 1 at 10–11.)  Such is the case as shown by the evidence.  Each individual Defendant reported, investigated, or charged potential violations of LPD general orders based on Stephens's complaints and comments.  Their actions were within the scope of their duties as employees of LPD.  Therefore, Walton, Schneider, McKenna, Parish, and Evans are immune from personal liability on Stephens's claims for intentional infliction of emotional distress and intentional interference with a contractual relationship.

a.     **Intentional interference with a contractual relationship**

Stephens's claim for intentional interference with a contractual relationship is asserted against the individual Defendants only.  Because they are immune from personal liability, the Court looks at whether they are liable in their official capacity.  As the Defendants have pointed out, under Indiana law, an action for intentional interference with a contract can be brought only against third parties, citing *Martin v. Platt*, 386 N.E.2d 1026, 1027 (Ind. Ct. App. 1979).  "Indiana courts have repeatedly rejected efforts by fired employees to pursue tortious interference claims against individual officers, directors, and other managers of employers who played a role in their termination."  *White v. Local Union No. 1111, UAW*, 2005 U.S. Dist. LEXIS 1647, at *43 (S.D. Ind. Jan. 20, 2005).  Where an agent of the contracting party is acting within the scope of his

authority and duties, liability will not accrue against the agent. *Kiyose v. Trustees of Ind. Univ.*, 333 N.E.2d 886, 891 (Ind. Ct. App. 1975); *Ward v. Indep. Order of Foresters*, 2006 U.S. Dist. LEXIS 11290, at *46–47 (S.D. Ind. Mar. 7, 2006). The Defendants further explain that this claim is statutorily barred against the individual Defendants (and the City of Lawrence) under Indiana Code § 34-13-3-3(6) because the claim is based on a loss resulting from the initiation of an administrative proceeding.

Rather than responding to these arguments, Stephens instead reasserts the elements of the claim and lists the factors for justification for any interference. The Defendants' arguments are well taken and supported by law. As agents of the City of Lawrence acting within the scope of their authority and duties, the individual defendants cannot interfere with the contractual relationship to which their principal is a party. Thus, summary judgment is appropriate in favor of the Defendants on Stephens's claim for intentional interference with a contractual relationship.

### b.    Intentional infliction of emotional distress

Next, Stephens's claim for intentional infliction of emotional distress is asserted against the City of Lawrence and the individual Defendants. Again, because the individual Defendants are immune from personal liability, the Court looks at whether they are liable in their official capacities. To prevail on this claim, Stephens must show that the Defendants intentionally or recklessly caused severe emotional distress to him by their extreme and outrageous conduct. *Cullison v. Medley*, 570 N.E.2d 27, 31 (Ind. 1991). "It is the intent to harm one emotionally that constitutes the basis for the tort of an intentional infliction of emotional distress." *Id.*

The Defendants explain that there is no evidence that the Defendants had any intent to cause Stephens to suffer emotional distress. They further explain that their actions—reporting, investigating, and charging potential violations of LPD general orders, and also conducting the

Merit Commission hearing in accordance with usual procedure—were not extreme or outrageous. The Defendants point to case law that holds the process of terminating an employee pursuant to a disciplinary system is not extreme and outrageous conduct. *See Powdertech, Inc. v. Joganic*, 776 N.E.2d 1251, 1264 (Ind. Ct. App. 2002) ("act of firing him pursuant to its disciplinary policy does not constitute extreme and outrageous conduct"); *Brock v. United States Steel Corp.*, 2011 U.S. Dist. LEXIS 87662, at *31 (N.D. Ind. Aug. 8, 2011) (same). Lastly, the Defendants assert that this claim is barred by Indiana Code § 34-13-3-3(6) because the claim arises from the initiation and result of an administrative proceeding.

In his response brief, Stephens fleetingly asserts that the individual Defendants' actions occurred while they were off duty or in defiance of LPD general orders, thus making them fall outside the scope of their employment. However, this late assertion contradicts Stephens's own pleadings wherein he alleged that the individual Defendants were employees of the City of Lawrence acting under the authority conferred upon them under the color of state law. Further, he presents no evidence showing that they were acting outside the scope of their employment. The Court rejects this argument from Stephens.

Stephens also argues that the Defendants' conduct was outrageous. He points to various facts and asserts that reasonable people could differ as to whether the conduct was extreme or outrageous. However, Stephens points to no evidence that suggests any intent to cause severe emotional distress. He does not address or respond to the case law holding that the process of terminating an employee pursuant to a disciplinary system is not extreme and outrageous conduct. And Stephens provides no response to the Defendants' argument that the claim is barred by Indiana Code § 34-13-3-3(6).

Stephens has failed to show through designated evidence a factual dispute regarding the Defendants' intent to cause severe emotional distress.  Additionally, this claim arises from the initiation and result of an administrative proceeding and is thus barred by Indiana Code § 34-13-3-3(6).  As a result, summary judgment is appropriate in favor of the Defendants on Stephens's claim for intentional infliction of emotional distress.

4.      **Stephens's Remaining Claims**

The claims remaining for the Court's consideration are the breach of contract and promissory estoppel claims against the City of Lawrence and the First Amendment retaliatory termination claim and Due Process claim against the City of Lawrence and the individual defendants in their official capacity.

a.      **Breach of contract and promissory estoppel**

First, Stephens builds his breach of contract claim on the settlement agreement that he reached with the City of Lawrence in his prior lawsuit.  On March 12, 2012, the settlement agreement was entered between Stephens and the City of Lawrence.  The provision of the settlement agreement at issue in this case gave Stephens an opportunity to purchase the police dog Yank from LPD under certain conditions.  The parties agreed that "should Stephens be assigned to another position or should Stephens or 'Yank' retire from the police department, Stephens will have the opportunity to purchase 'Yank' for fair market value." (Filing No. 42-19 at 3.)  Following his separation from LPD, Stephens demanded the opportunity to purchase Yank for fair market value.  The City of Lawrence refused Stephens's demand.  Stephens alleges that, by its refusal, the City of Lawrence has breached the settlement agreement.

In response, the Defendants explain that "[u]nder Indiana law, when the terms of a contract are clear and unambiguous, those terms are conclusive, and the court will not construe the contract

or look at extrinsic evidence but rather will simply apply the contract provisions." *John M. Floyd & Assocs. v. Star Fin. Bank*, 489 F.3d 852, 854 (7th Cir. 2007) (citation and quotation marks omitted).   The Defendants assert that the terms of the settlement agreement are clear and unambiguous, so the Court should simply apply the terms of the agreement.  They further assert that under the plain terms of the agreement Stephens is not entitled to purchase Yank.

Stephens replies that "retire" and "reassign" are ambiguous, and he did not voluntarily retire but, in fact, he did retire.  He also points to the fact that another LPD officer did not retire or get reassigned, but the City of Lawrence allowed the other officer to purchase his police dog.  This fact is irrelevant because the other officer did not have an agreement with the City of Lawrence that governed any potential purchase of the police dog; Stephens does have such a binding agreement.

The agreement between the City of Lawrence and Stephens gives Stephens the opportunity to purchase Yank for fair market value if (1) Stephens is "assigned to another position" or (2) if "Stephens or Yank retire from the police department."  There is nothing ambiguous about the agreement.  It is clear and unambiguous, and the Court must simply apply the contract provisions. Stephens was terminated from his employment with LPD.  He was not "assigned to another position," and he did not retire.  Further, there is no evidence that Yank has retired from the police department.  Thus, none of the conditions that would allow Stephens the opportunity to purchase Yank for fair market value have occurred.  Therefore, the City of Lawrence is not in breach of the contract by failing to accept Stephens's demand to sell Yank to him for fair market value. Summary judgment is appropriate in favor of the City of Lawrence on Stephens's claim for breach of contract.

Alternatively, Stephens asserts a claim for promissory estoppel against the City of Lawrence. He claims that, in exchange for the promise of the right to purchase Yank, he promised to dismiss his claims against the City of Lawrence in his prior lawsuit. Stephens relied on the City of Lawrence's promise to his detriment when he dismissed his prior lawsuit.

The Defendants respond that the City of Lawrence and Stephens entered into a written agreement (with an integration clause) that covered the subject matter and clearly and expressly set the terms for purchasing Yank. The City of Lawrence has not asserted that the agreement is not a valid contract, rather just that the conditions precedent have not occurred. An action in promissory estoppel is only available where there is no contract covering the subject matter at issue. *See Hinkel v. Sataria Distrib. & Packaging, Inc.*, 920 N.E.2d 766, 771 (Ind. Ct. App. 2010) ("Promissory estoppel permits recovery where no contract in fact exists."); *Volvo Trucks N. Am. v. Andy Mohr Truck Ctr.*, 2013 U.S. Dist. LEXIS 83881, at *8–9 (S.D. Ind. June 14, 2013) (same). The subject matter of Stephens's promissory estoppel claim is fully covered by the clear, express terms of the settlement agreement. Stephens provides no reply to the Defendants' argument and case law, which is well taken. The Court determines that summary judgment is appropriate in favor of the City of Lawrence on Stephens's claim for promissory estoppel.

### b.    First Amendment and Due Process claims

Finally, the Court turns to the First Amendment retaliatory termination claim and due process claim against the City of Lawrence and the individual Defendants in their official capacities. The First Amendment "prohibits a public employer from retaliating against an employee for engaging in protected speech." *Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 376 (7th Cir. 2009). The right to procedural due process applies to deprivations of life, liberty, and property. *DeSalle v. Wright*, 969 F.2d 273, 277 (7th Cir. 1992). If a plaintiff is

deprived of a protected interest, then the court must determine what process is due. *Leavell v. Ill. Dept. of Natural Resources*, 600 F.3d 798, 804 (7th Cir. 2010).

The district court applies a three-step analysis to First Amendment retaliation claims brought under 42 U.S.C. § 1983. First, the employee's speech must be constitutionally protected. Second, the employer's action must be motivated by the constitutionally protected speech. Third, if the action was retaliatory, the court considers whether the employer has demonstrated that it would have taken the same action irrespective of the employee's speech. *Milwaukee Deputy Sheriff's Ass'n*, 574 F.3d at 376. To establish a *prima facie* case, a plaintiff must show that (1) his speech was constitutionally protected, (2) he suffered a deprivation that would likely deter protected speech, and (3) the protected speech was at least a motivating factor in the defendant's actions. *Swearnigen-El v. Cook County Sheriff's Dep't*, 602 F.3d 852, 861 (7th Cir. 2010).

"Speech is constitutionally protected if (1) the employee spoke as a citizen on matters of public concern and (2) his interest in commenting upon those matters outweighs the employer's interest in promoting the efficiency of its services." *Id.* at 861–62 (citation and quotation marks omitted). "When employees make statements pursuant to their official duties, they are not speaking as citizens for First Amendment purposes." *Id.* at 862 (citation and quotation marks omitted). "Whether speech addresses a matter of public concern must be determined by its 'content, form, and context,' with content being the most important." *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 147–48 (1983)).

Procedural due process claims require a two-step analysis. First, courts consider whether the plaintiff was deprived of a protected interest, and second, courts then determine what process is due. *Leavell*, 600 F.3d at 804. The courts distinguish between due process claims based on established state procedures and due process claims based on random and unauthorized

23

deprivations by government officials. *Id.* at 804–05. Stephens's due process claim is based on the latter. "[W]hen the state conduct in question is random and unauthorized, the state satisfies procedural due process requirements so long as it provides a meaningful post-deprivation remedy." *Id.* at 805. "[F]or a plaintiff alleging a procedural due process claim based on random and unauthorized conduct of a state actor, the plaintiff must either avail herself of state post-deprivation remedies or demonstrate that the available remedies are inadequate." *Id.* Furthermore, "[i]f the plaintiff has not availed herself of state remedies, she cannot state a valid procedural due process objection . . . if she does not include a challenge to the fundamental fairness of the state procedures." *Id.*

Turning to this case, there is a factual dispute whether Stephens should be considered a citizen or an LPD officer at the time of his speech. Designated evidence supports both positions. Stephens was off duty, on his day off, running errands, and in civilian clothes at the time his comments were made and recorded. He also was at the City of Lawrence government building where he is known as an LPD officer, using his marked police car for transportation, and making photocopies in the government building when he had his conversation with McKenna. There also is a factual dispute whether Stephens's comments related to matters of public concern. Again, designated evidence supports both positions. In Schneider's summary of her investigation, she specifically noted that Stephens's comments about Parish committing ghost employment was a matter of public concern. Other comments concerned officer and public safety and inefficient use of taxpayer dollars. On the other hand, much of Stephens's comments seem to be personal complaints about individuals and practices that he dislikes.

"On summary judgment, a court may not weigh the evidence or decide which inferences should be drawn from the facts. Rather, the court's task is to determine based on the record

whether there is a genuine issue of material fact requiring trial." *Costello v. Grundon*, 651 F.3d 614, 636 (7th Cir. 2011). Such is the case here. Based on the summary judgment record, there are genuine issues of fact in dispute regarding the First Amendment claim that require trial.

Similarly, there are factual disputes supported by the designated evidence regarding the procedure that was afforded to Stephens both leading up to and culminating in the Merit Commission hearing and its decision to terminate Stephens. Stephens asserts that his pre-deprivation hearing was a sham because the outcome was predetermined before the Merit Commission even convened and heard evidence. He explains that the process afforded him both before and during the hearing was deficient. The Defendants explain that the hearing was not a sham and that Stephens's complaints regarding the decisions made during the hearing could have been adequately remedied by the post-deprivation judicial review process established by Indiana statute. The Defendants further explain that Stephens failed to utilize the adequate post-deprivation remedy available under state law.

The Merit Commission President's decision to hear and decide the "pretrial motion in limine" on the preliminary evidentiary issues in the presence of the entire Merit Commission should be considered when deciding whether due process was provided. The Merit Commission President seemed to view the procedure of admitting evidence as each side taking a turn losing their argument instead of just getting it right and admitting proper evidence regardless of which side offered it. Also concerning is the Merit Commission President's comments regarding his inability to do his best work because he was "under the influence of pharmaceuticals" and was "in a chemically induced fog" the week before the hearing.

Stephens did in fact utilize the post-deprivation remedy available under state law. On November 30, 2012, Stephens filed his verified petition for judicial review of the Merit

Commission's decision in the Marion Circuit Court.  However, Stephens realized that the judicial review was limited to the Merit Commission's process and determination, so on September 19, 2013, while the petition for judicial review was still pending, Stephens filed his Complaint in this Court, asserting claims for violation of his speech and due process rights and also the state law claims.  On November 12, 2013, the Defendants filed a motion to dismiss or stay this action based on the pending state court review.  In response, Stephens proposed filing a voluntary dismissal of the petition for judicial review in state court for purposes of judicial economy and to litigate all the claims between the parties in this Court.  The Defendants did not object to the voluntary dismissal.  Thus, Stephens filed his motion for voluntary dismissal in the state court in order to litigate all claims here.

Based on the record, the Court determines that summary judgment is not appropriate for either party on Stephens's due process claim.

## IV.  CONCLUSION

For the foregoing reasons, Plaintiff Stanley Stephens's Motion for Partial Summary Judgment (Filing No. 39) is **DENIED**, and Defendants City of Lawrence, Michael Walton, Erika Schneider, Michael McKenna, James Parish, and Scott Evans's Motion for Summary Judgment (Filing No. 47) is **GRANTED in part AND DENIED in part**.  Because *res judicata* does not apply in this case and qualified immunity protects the individual defendants in their personal capacities only, the First Amendment and due process claims remain pending for trial against the City of Lawrence and Walton, Schneider, McKenna, Parish, and Evans in their official capacities.

**SO ORDERED.**

Date: 11/30/2015

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

26

DISTRIBUTION:

Steven A. Holt
HOLT FLECK & ROMINE
sholt@hfrlaw.com

Travis W. Cohron
HOLT FLECK & ROMINE
tcohron@hfrlaw.com

James S. Stephenson
STEPHENSON MOROW & SEMLER
jstephenson@stephlaw.com

Ronald J. Semler
STEPHENSON MOROW & SEMLER
rsemler@stephlaw.com

Rosemary L. Borek
STEPHENSON MOROW & SEMLER
rborek@stephlaw.com